UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

VS.                            CASE NO: 8:14-CR-463-T-30AEP

OSCAR ABEL RAMIREZ CASTILLO
_____/

DEFENDANT OSCAR ABEL RAMIREZ CASTILLO'S SENTENCING MEMORANDUM

The Defendant, Oscar Ramirez Castillo (Ramirez), by and through his undersigned attorney, hereby files his Sentencing Memorandum, in which he asks this Court to grant a variance from the calculated guidelines and impose a reasonable sentence of incarceration, that is sufficient but not greater than necessary to comply with the statutory purposes of sentencing, and in support thereof states as follows:

I. Introduction:

Mr. Ramirez is scheduled for sentencing before this Court on July 23, 2015. The purpose of this memorandum will be to address the question of whether the Court should consider granting a variance from the calculated guidelines and whether such a finding would constitute a more appropriately reasonable and necessary sentence for his offence than the guidelines as calculated in the PSR.

II. Procedural Background.

On September 27, 2014, the defendant, along with 6

1

"crewmates", was arrested after the vessel on which he was traveling was interdicted and seized by the U.S. Coast Guard. It is estimated the vessel had been transporting a total of 562 kilograms of cocaine, most of which was found floating in a debris field after it had been jettisoned by the crew.

On November 19, 2014, the defendant was charged in a Two Count Indictment for Conspiracy to Possess with Intent to Distribute Five Kilograms or more of cocaine, and Possession with Intent to Distribute Five Kilograms or More of Cocaine, in violation of 46 U.S.C. 1903(g) and (j) and 21 U.S.G. 841(b)(1)(A)(ii). The defendant pled guilty to Count One of the Indictment on February 24, 2015, pursuant to a signed plea agreement, the government agreed to file for dismissal of Count Two of the Indictment.

### III. Factual Background:
### A. Personal and Family Background

The defendant was born on March 1, 1988, in a small Guatemalan village. Mr. Ramirez was born into a very poor family, even by the Guatemala's economic standards. His father, Remigio, worked as a subsistence fisherman. Mr. Ramirez's father, along with the defendant's mother, raised the defendant and his several siblings. The family continues to reside together on a small plot of land in several small houses in a communal setting. The family's poor financial circumstances forced the defendant to find menial employment after completing

only six years of school. The defendant has had no formal education since the sixth grade. Mr. Ramirez has tried to earn a living as a subsistence fisherman and other odd menial jobs.

**B. History of this offense.**

On September 27, 2014, the Defendant along with the co-defendants named in the Indictment, were on a small boat in international waters in the eastern Pacific Ocean. The defendants were from Guatemala, Ecuador and Colombia. The small boat was spotted by a United States maritime patrol aircraft. Upon realizing that the defendants were detected they began to throw items into the water. Later the U. S. Coast Guard recovered about 680 kilograms of cocaine from the water. A U. S. Coast Guard helicopter was able to stop the small boat after warning shots were fired. The defendants were taken into custody.

**C. Captivity of the Defendant while at Sea: September 27, 2014 until November 19, 2014.**

All defendants were taken into custody and the small vessel involved in the offense was processed and sunk. The defendants were placed on the U. S. Coast Guard vessel. Ramirez was put onto the deck of the Coast Guard vessel in handcuffs where he was chained to the several other detainees. He was aware he was in trouble and offered no complaints or resistance, but was sure he would be transported to jail on land or, at least, moved into a

hold or a brig somewhere on the Coast Guard vessel while it was at sea. This never happened. Mr. Ramirez remained on the exposed deck of that particular Coast Guard vessel, day and night, for nearly 2 weeks, shackled to the other prisoners. After that, the prisoners were transported by a small boat to another Coast Guard vessel, and then after several weeks another, but the conditions for the detainees did not change. The prisoners were kept on the deck of the various vessels, chained to one another, and not provided shelter below the decks.

During their captivity the only shelter provided to the captives was a small tarp, which did provide occasional shade from the sun, but proved ineffective as protection from the rain, which was frequent; or the night chill, which became more pronounced as September turned into November. The prisoners were not fed the same food as their captors, but were given some canned fruit salad and some occasional rice and beans. They did have plenty of water. Occasionally, one of the prisoners would request some more food, or offer a complaint about a sickness or sunburn. In response, they were encouraged to drink more water.

Some of the prisoners became quite ill during the passage, which proved to be very unpleasant to those who were shackled to them. They did not have a latrine available for use, but were provided with five gallon plastic buckets. They were not issued private buckets, but were required to share the buckets. A medic did examine the prisoners several times, and they were pronounced fit for detention, and were educated on maintaining proper

4

hydration and the importance of stretching. During his about eight week captivity, the defendant lost a substantial amount of weight. To say the least, Mr. Ramirez suffered physical and mental anguish during the eight weeks of captivity on the U. S. Coast Guard vessels.

**IV. Pre-sentence Investigative Report and Recommended Guidelines**

In the pre-sentence investigation report submitted in this case the defendant has been calculated to have a base offense level of 38. The Report correctly indicates the defendant meets the criteria set forth in subdivisions (1)-(5) USSG 5C1.2(a), therefore decreasing the offense level by two levels. The PSR also correctly recommends the three level reduction for acceptance of responsibility. According to the PSR, the defendant's total level is 33, and with a criminal history category of 1. The PSR's recommended guideline range for sentencing is 135 to 168 months.

Mr. Ramirez hereby fully adopts his response to the PSR which was previously submitted to the Probation Officer on July 14, 2015. And Mr. Ramirez requests that his July 14, 2015, response to the PSR be provided to the Court for review and consideration for sentencing. However, Mr. Ramirez does not request that his said response to the PSR be made part of the Court's public file as the response contains personal and confidential information.

It is the defendant's position that the defendant should be considered for a reasonable variance from the recommended

5

guideline sentence and respectfully requests this Court sentence him to a period of time that is sufficient but not greater than necessary.

**V. Memorandum of Law**

A.  Since *United States v. Booker* 543 U.S. 220, 125 S.Ct. 738 (2005), Federal District Criminal Courts are obliged to assess the need for the sentence imposed –

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offence;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with the needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. 3553(a)(2).

The Courts must also examine, as mandatory considerations:

> …the nature and circumstances of the offense and the history and the characteristics of the defendant; the kinds of sentences available; any pertinent policy statement issued by the Sentencing Commission; the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victim of the offense. 18 U.S.C. 3553(a)(1), (3), (4)-(7).

If this Court agrees with the total offense level and criminal history as calculated in the PSR, the defendant urges the Court to consider a downward variance from the PSR's recommended sentence. In the case of *United States v. Myers*, 353 F.Supp.2d 1026 (S.D. Iowa Jan 25, 2005), the court observed the

following; "If the 600-plus pages of the most recent set of sentencing guidelines have taught us anything, it is that punishment cannot be reduced to an algorithm" *Myers* at 1027 (quoting the Honorable Myron Thompson, Editorial, *Sentencing and Sensibility*, N.Y. Times, January 21, 2005). The defendant believes that this observation would be well considered in determining an appropriate sentence in the present case.

**B. The defendant's role in the offense should be considered.**

Whether or not the Court formally finds the defendant to have a "minor" or "minimal" role in the offense under U.S.S.G. 2D1.1(a)(3) see **United States v. Dorvil**, 784 F.Supp. 849 (S.D. Fla. 1999); and **United States v. DeVaron**, 175 F. 3rd 930 (11th Cir. 2000), it is highly appropriate that the defendant's actual role be considered when fashioning an appropriate sentence. Mr. Ramirez was not "essential" to the operation and completion of the conspiracy involving the cocaine found to be transported by the small boat. He was certainly less culpable than those who owned the boat, as well as the captain of the vessel. The evidence in this case shows the Mr. Ramirez was, at most, on the boat to lift the packages. He was nothing more than a "mule". There is no evidence that he ever owned the boat, guided the boat, or drove the boat. His presence on the boat is consistent with nothing more than the labor required for removing contraband. Additionally, Mr. Ramirez lacked any knowledge and understanding of the scope and structure of the enterprise and had no proprietary interest in the cocaine.

7

**C. When considering the factors reflected in section 3553, particularly when focusing on the "history and characteristics of [this] defendant", it would be appropriate for this Court to grant a downward variance from the recommended guideline sentence**

As described above, from all indications, prior to the activities that gave rise to this offense Mr. Ramirez was living an exemplary, if poverty-stricken life. He has a very close relationship with his parents, siblings, and entire extended family. He has had no prior problems or encounters with the Guatemalan authorities, and appears to be a person held in some esteem by those who know him. Attached to Mr. Ramirez's July 14, 2015, response to the PSR are (translated) letters and photograph which were provided by Mr. Ramirez's family. The letters and photograph demonstrate Mr. Ramirez's good character and reputation in his home community. The letters and photograph illustrate the extreme poverty that Mr. Ramirez and his family live in. All indications are that the behavior that brought him before this Court is atypical, and extraordinarily unlikely to be repeated when he finally returns home to live with his beloved family.

**D. When considering the factors reflected in section 3553, particularly when focusing on a "just punishment for the offense", it would be appropriate for this Court to consider the conditions endured by the defendant during the first 54 days of his captivity.**

The defendant has clearly expressed his remorse for the behavior which has resulted in these charges. He deeply regrets the personal weakness and fear that led him to use such poor judgment, which will surely cost him years of incarceration, and

8

bring added hardship to his beloved family. He is not unmindful of evils of the drug trade, and the misery and violence that business has wrought. He has seen it all first-hand in his native land and deeply regrets whatever contributions his bad judgment made to narco-trafficking. As bad as his behavior was, however, it did not warrant the treatment he was subjected to for nearly two months while being forced to endure the harsh elements while shackled together with other detainees under a tarp on the deck of various United States law enforcement vessels. It is very reasonable to suggest that the mental and physical anguish, suffering and deprivations suffered during this extended time period should be factored into this Court's final determination of a reasonable sentence that is well below the PSR's suggested USSG sentence.

Since the term on "war on drugs" was coined by President Nixon "Nixon Calls War on Drugs". *The Palm Beach Post*. 18 June 1971, there has been much debate about whether what resulted amounted to an actual "war", or just metaphor for a series of laws and government policies directed at the control of a societal problem. What is less debatable is it has taken on the appearance of war, complete with the expenditure of billions; armed conflict with a corresponding loss of life; and, as is evidenced in this case, the deployment of all branches of the American military. As in most wars, the taking of prisoners is a necessary and foreseeable product of the actions taken. Indeed, it may be argued that in waging this war, the taking of prisoners

9

is the primary objective. The Impact of the War on Drugs on U.S. Incarceration". *Human Rights Watch*. May 2000.

For the sake of argument, it is interesting to contemplate that if this "war" was properly formalized as a declared act of congress, the treatment of the prisoners taken in its name may be subject to the rules of the Geneva Conventions. The Geneva Conventions are rules that apply in times of armed conflict and seek to protect people who are are no longer taking part in hostilities; these include the sick and wounded and members of armed forces at sea, prisoners of war and civilians. The third convention dealt specifically with the treatment of prisoners of war during times of conflict "The Geneva Convention Relative to the Treatment of Prisoners of War". *The American Journal of International Law* **47**: 119-117. 1953. Article 25 of Geneva Convention III provides as follows:

> Prisoners of war shall be quartered under conditions as favorable as those for the forces of the Detaining Power who are billeted in the same area. The said conditions shall make allowance for the habits and customs of the prisoners and shall in no case be prejudicial to their health.
> The foregoing provisions shall apply in particular to the dormitories of prisoners of war as regards both total surface and minimum cubic space, and the general installations, bedding and blankets.
> The premises provided for the use of prisoners of war individually or collectively, shall be entirely protected from dampness and adequately heated and lighted, in particular between dusk and lights out. All precautions must be taken against the danger of fire.
> In any camps in which women prisoners of war, as well as men, are accommodated, separate dormitories shall be provided for them. *Text of the Third Geneva Convention*

Obviously, in this case the prisoners taken off the *Moises*

were not afforded the quarters mandated by Article 25. Several frightened men were chained together for weeks at sea, with limited food and medical attention, allowed only a few square feet of area to share along with buckets to contain their vomit and shared waste. Indeed, risking hyperbole, the treatment received by the detainees while on the decks of the various U. S. Coast Guard vessels is shocking to the conscience of civilized society. These detainees from poor villages in Guatemala and Ecuador deserved substantially better care and more humane treatment.

Pointing out that the *Moises* crew were not truly enemy soldiers does not excuse their treatment. It does not take much to imagine the outcry if this arrest occurred within the United States once it was learned that the arrested offenders were shackled together under a tarp on the exposed deck of various U. S. law enforcement vessels and exposed to the natural elements of weather for weeks at a time. Whether prisoners of war or detained drug offenders, it is shocking to realize this sort of treatment of prisoners of the United States.

Mr. Ramirez does not want to belabor this point, and understands that the bad choices he has made has brought him hard consequences. His description of the captivity was related to his attorney in an off-handed manner, and only in response to direct questions about why it took so long for the crew of the *Moises* to be brought to shore. It was told with no regard for its potential use as a defense or mitigation. The story was

apparently confirmed by some of the other defendants on the Moises who bothered to mention it. He was not beaten or treated sadistically by his captors, and he bears them no ill-will. It is likely that the treatment and onboard situation was the result of the lack of resources and available quarters for prisoners. It is hoped, however, that in the future the U. S. Coast Guard will not continue to inadequately treat prisoners physical requirements and will expediently remove prisoners off the boat deck to a dry and protected from the natural elements location.

There is no reason why the Court should not consider the conditions endured by Mr. Ramirez when fashioning a reasonable sentence. Surely, his punishment began upon his arrest, and he will be given credit for the time he was incarcerated on the various U. S. Coast Guard vessels. When determining a "just punishment for the offense" under section 3553, it is very reasonable for this Court to factor not only the length of time he has served, but the disproportionate punishment/suffering inflicted during the time while on the various Coast Guard vessels.

It is the defendant's position that a sentence in the PSR's recommended guideline range does not adequately address the above-noted considerations and would result in considerably more incarceration time than this situation calls for. A sentence **significantly** below the PSR's recommendation will more than adequately reflect that this is a serious offense and serve to

adequately deter further criminal conduct and protect the public. Moreover, it will address the specific characteristics of this Guatemalan fisherman with no prior criminal record.

### V. Conclusion

For foregoing reasons, Mr. Ramirez respectfully requests that this Honorable Court consider imposing a sentence less than 60 months and in the alternative asks for a punishment sufficient, but not greater than necessary, to achieve the ends of justice and to comply with the statutory purposes of sentencing.

I HEREBY CERTIFY that on July 16, 2015, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which system will automatically send a notice of electronic filing to all counsel of record.

s/Ronald Marzullo
Ronald Marzullo, ESQUIRE
P. O. Box 1205
Valrico, FL. 33595
Tel: (813)662-3080
FBN. 613177
Email: marzullorj2@hotmail.com